**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| MICHEL ACEVEDO-REINOSO, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> IBERIA LINEAS AEREAS DE ESPANA, ET AL., <br><br> Defendants, | Civ. No. 03-1115(PG) |

**OPINION AND ORDER**

On March 22, 2005, the Court granted defendants' Motion to Dismiss for failure to state a claim under the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 3014, T.S. 876 (1934), note following 49 U.S.C. § 40105 (hereinafter "the Warsaw Convention" or "the Convention"). On May 23, 2006, the Court of Appeals vacated the District Court's Order and remanded the case for further proceedings. On remand, the District Court was ordered to determine whether Plaintiff Michel Acevedo-Reinoso's accident occurred "in the course of any of the operations of embarking or disembarking" pursuant to Article 17 the Convention. If the Court answers the question in the affirmative, the Convention will apply and would preempt plaintiffs' Puerto Rico tort claim. If, on the other hand, the District Court answers the question in the negative, the Convention has no application and plaintiffs' case would go forward on the elements of the tort claim set forth under Puerto Rico tort law. Upon receiving the mandate, the District Court held a hearing in which the parties argued their respective positions regarding the applicability of the Warsaw Convention. Thereafter, plaintiffs filed a motion informing the Court of further case law on the issue. Having re-examined the applicable case law, the Court hereby finds that the Warsaw Convention does not apply to plaintiffs' case. Accordingly, their Puerto Rico tort law claim is not preempted.

Civ. No. 03-1115(PG)                                                    Page 2

## BACKGROUND

Plaintiff Michel Acevedo Reinoso ("Acevedo") is a citizen of Cuba with legal residence in the United States of America and currently residing in Puerto Rico. (Complaint, Docket No. 1 at 2.) Plaintiff Maria T. Pacheco Gonzalez ("Pacheco"), Acevedo's consensual partner, is a citizen of the United States of America and a resident of Puerto Rico (collectively "plaintiffs").(Id.)

In October 2002, plaintiffs were invited to participate in the Mortgage Loan Officer Association's ("the Association") Annual Convention to be held in Madrid, Spain. The Association retained The Travel Place Agency to coordinate all travel arrangements for the convention's attendees. (Id. at 3.) Plaintiffs called The Travel Place and at the request of its owner, Mrs. Magdalena del Valle Ferre ("Del Valle"), sent their passports and Acevedo's Resident Alien card. (Id.) Acevedo asked del Valle to make sure that all of his immigration documents were complete and that no further documents or visas were required for his entry to Spain. (Id.) This was the first time Acevedo would visit Spain. (Id.) Del Valle assured him that as a Resident Alien of the United States he would only need to show his passport and Resident Alien card. (Id.)

On November 13, 2002, plaintiffs arrived at Luis Muñoz Marin International Airport and went to the Iberia Lineas Aereas Españolas, S.A.'s ("Iberia") counter to check-in. At the request of an Iberia agent, Pacheco showed her passport and Acevedo his Resident Alien card. The Iberia agent informed them that all immigration documents were in place and gave them their Boarding Passes. (Id.) Plaintiffs arrived at Madrid the following day. (Id.)

Upon their arrival, a Spanish immigration officer requested each passengers' passports. (Id.) Acevedo showed the officer his Cuban passport and his Resident Alien card. Immediately, the Spanish authorities detained Acevedo, led him to a closed room at the Madrid airport, and questioned him. (Id. at 4.) Meanwhile, Pacheco became hysterical and frustrated seeing her partner detained and humiliated in front of his peers from the banking

Civ. No. 03-1115(PG)                                                    Page 3

industry. (Id.) Pacheco requested assistance from Del Valle but none was provided. (Id.) She then visited the Cuban and American embassies and was informed that Acevedo would need a visa. (Id.) Acevedo inquired about his deportation and was informed that he would be deported to his country of origin, Cuba. (Id.) Understandably, Acevedo suffered great anguish. He became extremely nervous and scared thinking of what he would encounter upon his arrival to Cuba, a place he was forced to leave many years ago. (Id.) Later that same day, Acevedo was taken to yet another room where he was strip searched and humiliated by a Spanish officer. (Id.) He was then taken to yet another room with hundreds of illegal immigrants where he was served his first meal of the day and was forced to spend the night in a very cold room without sheets or blankets. (Id.) During that night, Acevedo witnessed the brutal beating by Spanish officers of a young immigrant from Ecuador who had stood up to go the bathroom. (Id.) The following morning, after continuos inquiries about his deportation, and at Acevedo and Pacheco's insistence, he was escorted by Spanish guards to an Iberia flight to San Juan, Puerto Rico. (Id. at 6.)

On February 5, 2003, plaintiffs filed suit against Iberia claiming damages as a result of the latter's negligence in failing to advise Acevedo that he needed a visa to enter Spain. (Id.)

### DISCUSSION

The Warsaw Convention's primary purpose is to "achieve uniformity of rules governing claims arising from international air transportation." Eastern Airlines v. Floyd, Inc., 499 U.S. 530, 552 (1991). "To provide the desired uniformity, Chapter III of the Convention sets out an array of liability rules which, the treaty declares, 'apply to all international transportation of persons, baggage, or goods performed by aircraft'." El Al Israel Airlines, LTD., v. Tsui Yuan Tseng, 525 U.S. 155, 167 (1999); see Article I of the Warsaw Convention, 49 U.S.C.A. § 40105.

Civ. No. 03-1115(PG)                                                    Page 4

Pursuant to Articles 17, an air carrier

> shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Id. "The applicability of the Convention depends on whether the accident occurred 'on board the aircraft or in the course of any of the operations of embarking or disembarking'." Dick v. American Airlines, Inc., 476 F.Supp.2d 61, 62 (D.Mass.2007).

In their complaint, plaintiffs claim that the carrier's failure to advise Mr. Acevedo of the need for a visa to enter Spain caused him damages. In other words, but for Iberia's negligence (accident) he would not have suffered the eventual detention in Spain (injury). The accident alleged did not occur on board the aircraft. Therefore, to ascertain whether the Convention applies, the Court must determine whether Mr. Acevedo's accident[1] occurred while

---

[1] The Court of Appeals states that the issue to determine is whether the **injury** occurred in any of the operations of embarking or disembarking. The language of the Convention, however, states that Article 17 applies if the **accident** which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking. Id., 49 U.S.C.A. § 40105 (emphasis added). Courts have used the terms "accident" and "injury" somewhat indistinctively when deciding whether the "event" at issue triggers Article 17 or not. This may be because only when a person suffers death or bodily injury may he or she recover under the Convention. See Eastern Airlines, 499 U.S. at 552("mental or psychic injuries unaccompanied by physical injuries are not compensable under Article 17 of the Convention.") However, using the term "injury" can lead to confusion as not always the accident and the injury are one and the same. An accident under the Convention is "an unexpected or unusual event or happening that is external to the passenger," Air France v. Saks, 470 U.S. 392, 405 (1985). The term "injury" encompasses a panoply of meanings. Using the term "injury" may give the impression that only if the person suffers the injury where the accident occurred the Convention applies. See Prescod v. AMR, Inc., 383 F.3d 861 (9th Cir. 2004). For example, in a slip and fall case the injury is normally contemporaneous to the accident. However, as here, when the situation that eventually causes the injury does not occur at the same time or close thereto to the accident, like in a case of a death several days after the accident, the Court must look at the circumstances surrounding the accident and not the injury. See Prescod, 383 F.3d at 869("The Convention does not state that the ultimate injury or death, as opposed to the relevant accident, must occur at any particular time following the accident. Instead a passenger's delayed reaction to an Article 17 accident resulting in injury or death is actionable so long as the accident itself took place 'on board the aircraft or in the course of any of the operations of embarking or disembarking'.")Indeed,

Civ. No. 03-1115(PG)                                                    Page 5

"embarking" or "disembarking" within the meaning of Article 17.

The Supreme Court has not yet had occasion to define these terms in the context of Article 17. See McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 316 (1st Cir.1995)(and cases cited therein). "Given the historical record and the signals that the Supreme Court has sent, most courts have interpreted the terms 'embarking' and 'disembarking' to connote a close temporal and spatial relationship with the flight itself." Id.

The majority of the Courts of Appeals have used a three-pronged test to determine whether the accident meets Article 17's criteria. Id. at 316-17. The inquiry focuses on (1) the passenger's activity at the time of accident, (2) his or her whereabouts when the accident occurred, and (3) the extent to which the carrier was exercising control at the moment of accident. See id. at 317; see Day v. Trans World Airlines, Inc., 528 F.2d 31, 33 (2d Cir.1975)(Applying a tripartite test based on activity (what the plaintiffs were doing), control(at whose direction) and location, to determine that Article 17 covered the accident.) The Day Court "reasoned that the drafters of the Warsaw Convention were concerned not just with the location of the passenger, but also with whether the passenger's actions were a part of the process of embarking or disembarking." See Schroeder v. Lufthansa German Airlines, 875 F.2d 613, 617 (7th Cir.1989)(quoting Day, 528 F.2d at 33 and adopting tripartite test). In addition to the Second and the Seventh, the First, Third, and Ninth Circuits have also approved the use of these three factors in delineating the boundaries of Article 17. See Evangelinos v. Trans World Airlines, Inc., 550 F.2d 152, 155 (3d Cir.1977)("three factors are primarily

---

focusing on where the injury as opposed to where the accident occurred could lead to conflicting rulings which runs contrary to the Convention's purpose of achieving uniformity regarding the rules governing claims arising from international air transportation. See Eastern Airlines, 499 U.S. at 552. Therefore, to avoid any possible confusion and being faithful to the Convention's language, the Court will use the term "accident" and not "injury" in its discussion of whether the event alleged in the complaint occurred in the course of any of the operations of embarking or disembarking. See McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 317 (1st Cir.1995)(the language of Article 17 speaks to accidents that occur in the course of any of the operations of embarking)(citation omitted).

Civ. No. 03-1115(PG)                                                    Page 6

relevant to a determination of the question of liability under Article 17: location, activity of the person, and the control by defendant of such person at the location and during the activity taking place at the time of the accident"); Martinez Hernandez v. Air France, 545 F.2d 279, 282 (1st Cir.1976)(adopting the Day-Evangelinos tripartite test, namely, nature of a plaintiff's activity, its location, and the extent to which the airline was exercising control over plaintiff at the time). Cf. Maugnie v. Compagnie Nationale Air France[2], 549 F.2d 1256, 1262 (9th Cir.1977)(Day test applied to find plaintiffs were injured during the course of embarking and also considering the totality of the circumstances surrounding a passenger's injuries).

The Eleventh Circuit uses another approach and considers whether an accident and an injury occurred and whether both took place while "embarking" or "disembarking" or during the flight itself. Marrotte v. American Airlines, 296 F.3d 1255, 1259 (11th Cir. 2002). Contra Prescod v. AMR, Inc., 383 F.3d 861, 869 (9th Cir. 2004)(declining to extend the Marrotte test finding it overly narrow inasmuch as the Convention only speaks of the location of the accident and not the injury); Kalantar v. Lufthansa German Airlines, 276 F.Supp 2d 5 (D.D.C.2003)(declining to follow the Marrotte test and applying the McCarthy test).

The three factors-activity, location, and control-, are not "separate legs of a stool, but, rather, [form] a single, unitary base." McCarthy, 56 F.3d at 317. Indeed, "the factors are inextricably intertwined." Id.

With regards to the first part of the test, the First Circuit has determined that "the original drafters viewed embarkation as 'the physical activity of entering or exiting from an aircraft rather than as a broader

---

[2] The Schroeder Court stated, based on the Maugnie decision, that the Ninth Circuit uses a slightly different test inasmuch as it only uses the totality of the circumstances test. A review of the Maugnie opinion, however, reveals that the Court applied the Day tripartite test as well. Schroeder, 875 F.2d at 617.

Civ. No. 03-1115(PG)                                                    Page 7

notion of initiating or ending a trip[3].'." Dick, 476 F.Supp.2d at 63(citing Martinez Hernandez, 545 F.2d at 283-84); see also Evangelinos, 550 F.2d at 155. This "tight-tie" requirement "informs location as well as activity." McCarthy, 56 F.3d at 317.

The location requirement is met when the accident occurs "in a place 'not too remote from [the] location at which [the passenger] is slated actually to enter [or exit] the designated aircraft'." Dick, 476 F.Supp.2d at 63 (quoting McCarthy, 56 F.3d at 317).

As to the third prong of the test, the carrier's control over the passenger must be "meaningful." See Dick, 476 F.Supp.2d at 64 (citation omitted). Finally, some courts have also considered the imminence of final boarding as a fourth factor to be weighed. See Day, 528 F.2d at 33-34; Buonocore v. Trans World Airlines, Inc., 900 F.2d 8, 10 (2nd Cir.1990); Marotte, 296 F.3d at 1260; Kalantar, 276 F.Supp.2d at 10.

Applying the three factors discussed above to the facts of the case, the Court finds that Mr. Acevedo's accident did not take place in the course of any of the operations of embarking or disembarking withing the meaning of Article 17.

When Mr. Acevedo's accident occurred (check-in at Iberia's counter) he was not physically boarding or exiting the aircraft. Neither was he in line waiting to enter the plane. See e.g. Jefferies v. Trans World Airlines, Inc., No. 85 C 9899, 1987 WL 8168, *4 (N.D.Ill.March 17, 1987)(holding that the Warsaw Convention applies to injuries resulting from falling while joining the line to board the plane). He was not in close proximity to the passengers gate where he would embark the aircraft, see Buonocore, 900 F.2d at 10, and had not completed the activities required as a prerequisite to boarding. See Day v. Trans World Airlines, 393 F.Supp. 217 (S.D.N.Y. 1975) aff'd, 528 F.2d 31 (2nd Cir.1975) cert. denied, 429 U.S. 890 (1976). Indeed, he still had to go to the

---

[3] This may be a narrower interpretation than that of other courts. See Fazio v. Northwest Airlines, Inc., No. 1:03-CV-808, 2004 WL 1001234, at *3 (W.D.Mich. Mar. 15, 2004).

Civ. No. 03-1115(PG)                                                    Page 8

terminal, pass through the security check point, and proceed to the gate from which his flight would be departing. See Sweis v. Trans World Airlines, Inc., 681 F.Supp. 501, 505 (N.D.Ill.1988)(Convention did not apply because plaintiffs were too remote from physical embarkation inasmuch as they still had to go through passport control and a security check, make their way to the boarding gate, and wait for their flight to be called); In Upton v. Iran National Airlines Corp., 450 F. Supp. 176, 178 (S.D.N.Y.1978) aff'd (without opinion) 103 F.2d 215 (2nd Cir.1979)(plaintiffs were not embarking because before they could board airplane they would still have to move through passport control and customs control, wait in a lounge reserved for departing international passengers, and submit to a security check before leaving the terminal to board the airplane). In sum, Mr. Acevedo's accident does not meet the activity and location requirements as there is no 'tight tie' between his accident and the physical act of entering or exiting an aircraft. See McCarthy, 56 F.3d at 316-17; see also Eljanjjar, V. Northwest Airlines, Civil Action No. H-04-680 & H-04-681, 2005 WL 1949545, at *4 (S.D.Tex.August 15, 2005)(finding that claims based on defendant's conduct at "check in" located at the boarding gate were not preempted because the encounter was not proximate in time to plaintiffs' actual boarding and it was not clear to what extent plaintiffs were under the control of defendants' agents.)

   With regards to the carrier's control, although it could be argued that at the check-in counter Mr. Acevedo was under defendant's control, said control was not "meaningful" enough to trigger Article 17 of the Convention. Going to the ticket counter, doing the check-in, and getting one's ticket is just one of the many steps that must be taken before embarking. Mr. Acevedo was free to move around the airport, was not restrained, and neither was he being led by defendant's agents to designated areas for passengers only or under the sole control of the carrier. See e.g. Sweis, 681 F.Supp. at 505 (finding Convention inapplicable because contrary to the Day plaintiffs who were told by airline personnel to stand in line at the boarding gate, had to obey if they wanted to get on the flight, and were segregated from those on

Civ. No. 03-1115(PG)                                                    Page 9

other flights and other airlines, the Sweis plaintiffs had not been told to go someplace at a specific time, were not required to get boarding pass at a specified time, and were free to visit non-passengers); Upton, 450 F.Supp. at 178(Warsaw Convention found inapplicable because plaintiffs were free to proceed to restaurants, visit with non-passengers, or exit the building thus had not yet entered into any control situation). Even assuming that defendants did have control of Mr. Acevedo, "[c]ontrol ....alone, would not be enough to bridge the moat that surrounds Article 17 inasmuch as the principal question is how proximate the circumstances of the accident are –in time, space, and purpose– to the physical activity of getting on [or off] the plane." See Dick, 476 F. Supp. 2d 61.

In sum, having jointly weighed the three Day/McCarthy factors--location, activity and control--, the balance tips in favor of finding that Mr. Acevedo's accident does not meet Article 17's requirements[4]. Therefore, because the accident did not occur 'in the course of any of the operations of embarking or disembarking', the Warsaw Convention does not preempt plaintiffs' claim.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, September 4, 2007.

                                        S/JUAN M. PEREZ-GIMENEZ
                                        U. S. DISTRICT JUDGE

---

[4] Even if the Court were to consider Mr. Acevedo's arrest in Spain as the "accident", the Convention does not preempt false imprisonment claims that are based on incidents that occurred after plaintiff had fully disembarked. See Eljanjjar, 2005 WL 1949545, at *4; see also Knoll v. Trans World Airlines, Inc., 610 F.Supp. 844, 847 (D.Colo.1985)(holding that activities related to immigration and customs are not conditions imposed by the airline for disembarking). See e.g., Alleyn v. Port Authority of New York, 58 F.Supp.2d 15, 19-21 (E.D.N.Y.1999)(discussing cases).